[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, Heritage Harbor, Inc. ("HH") and Hammonassett River Marina, Inc. ("HRM") brought these actions by complaints dated August 2, 1991 against the defendants, Richard S. Czell ("Ritt") and Jeanne P. Czell ("Jeanne"), claiming money damages, costs and reasonable attorney's fees for the breach of leases as to which the defendants had personally guaranteed. Said actions were CT Page 1318-A originally filed with the Superior Court-Housing Session for the Judicial District of Fairfield. On May 16, 1991 the Court (Leheny, J.) ordered the cases consolidated and transferred to the Superior Court-Housing Session for the Judicial District of New Haven.
On June 1, 1992, the defendants filed an answer, three special defenses and a two count counterclaim in each action. On August 5, 1992, the plaintiffs filed a reply to the special defenses, an answer and special defense to the counterclaim, and an amended complaint in each action. On November 5, 1992, the defendants filed an answer, special defense to the amended complaint and counterclaim in each action. On November 6, 1992, the plaintiffs filed a reply to special defenses and an answer and special defenses to the amended counterclaim in each action. On January 20, 1993, the defendants filed a reply to special defenses in each action.
FACTS
On or about June 9, 1987, HH and HRM, as lessors, leased certain premises located at 178 Cottage Road, Madison, Connecticut CT Page 1318-B (the "HH Marina") and 18 Stony Point Road, Clinton, Connecticut (the "HRM Marina"), respectively, to Ritt's Seaport Marina, Inc. (the "Tenant"), as lessee, pursuant to written leases (the "HH Lease" and the "HRM Lease", respectively) for terms commencing June 1, 1987 and ending May 31, 1992. Exhibits A and B. On or about June 9, 1987, the defendants executed, in Connecticut, separate personal guaranties of the Tenant's obligations under both the HH and the HRM leases. On or about January 31, 1989, HH, HRM, the Tenant and the defendants modified both the HH and HRM leases and the guaranties. Exhibits F and G. The Tenant vacated and the plaintiffs accepted the surrender of both marinas on or about September 17, 1991. The Tenant paid no rent under the HH lease for the months of April, 1991 through and including May, 1992. The Tenant paid no rent under the HRM lease for the months of February, 1991 through and including May, 1992. The Defendants have made no payments to the plaintiffs under the guaranties.
HH and HRM were both Connecticut corporations formed, owned and run by Michael Gray ("Gray") and Franklin Rubenstein ("Rubenstein") for the purpose of acquiring and operating the marinas. Neither had any experience owning or operating a marina CT Page 1318-C prior to their acquisition of the HH marina and the HRM marina. The HH marina was acquired on December 31, 1986. Exhibit 3. The HRM marina was acquired on November 20, 1986. Exhibit 4. From the time of the acquisition of the marinas until the leases with the Tenant commenced, Gray and Rubenstein hired people experienced in the running of marinas to handle the day-to-day operations of both marinas.
After the purchase of the marinas, Gray and Rubenstein discussed whether to continue to operate the marinas on their own or to lease them to a third party. As part of these discussions, Rubenstein prepared a projection of the revenues and expenses for the period April 1, 1987 through March 31, 1988. Exhibit 2. He projected that all the summer boat slips could be rented at both marinas because boats slips were in very high demand with relatively low supply. He also projected the rental rate for the slips could be increased from $23.00 per lineal foot that was being charged for the 1986 season to $40.00 per lineal foot. Further, Rubenstein projected the number of boats that could be stored during the winter would go up from 167 to 250 at a rent increased from $18.00 per lineal foot for the HH marina and $15.50 per lineal CT Page 1318-D foot for the HRM marina to $22.00 per lineal foot for both marinas. He made some projections for the rental of the house on the HRM marina property and the stores located at both marinas, leaving blank any revenues for "racks" and "service". He made expense projections in nine separate categories. Rubenstein projected, for the period April 1, 1987 to March 31, 1988, that the two marinas would generate a positive cash flow before debt service of $181,000.00. Exhibit 2. His projections were based on a major clean up of both marinas. After the discussion, Gray and Rubenstein decided to lease out the marinas. Gray attempted to find potential tenants for the marinas who might be able to generate rentals comparable to the projections while assuming responsibility of actually operating the marinas.
Ritt discovered through word of mouth that the two marinas were available for lease. Ritt's own lease at Rex Marina in Norwalk had expired and he and Jeanne were looking for a new business opportunity. Ritt met Rubenstein and first visited the marinas in March, 1987, returning to the marinas on numerous occasions between then and the execution of the leases. Jeanne visited the marinas once in the spring of 1987. Ritt handled the CT Page 1318-E negotiations of the lease with Rubenstein and Gray. During the lease negotiations, Rubenstein told Ritt the number of boats stored at each marina for the winter of 1986-1987, the length of the boats, and the charge per foot for dockage and storage. Rubenstein also told Ritt that it was his understanding from the previous owner that the HH Marina had been fully rented during the summer of 1986. From the beginning, Rubenstein told Ritt that the rent for the two marinas would be $150,000.00, allocated between the two marinas. Rubenstein's justification was that he believed he and Gray could bring in over $180,000.00 in net revenue before debt service, as shown on the projection document that he had prepared during his discussions with Gray. Exhibit 2. Rubenstein gave a copy of the projection document to Ritt. During the time period of the negotiations, Jeanne prepared her own projection document which Ritt gave to Rubenstein. Exhibit VV. The Czells' projection document supported their negotiating position that the rent for the marinas should only be $100,000.00. Ritt believed he could run the marinas much more profitably than the previous owners by cleaning up the property and because of his experience in managing marinas. However, Ritt projected only $100,000.00 in winter storage as opposed to the $164,000.00 projection in winter storage projected CT Page 1318-F by Rubenstein. Exhibit VV and Exhibit 2. Rubenstein held firm on the $150,000.00 rental price and Ritt eventually agreed to the price. However, Ritt extracted a concession from Rubenstein that the rent payments would not commence until September, 1987, thereby effectively reducing the first year's combined rent to $112,500.00. Two leases were eventually executed by the parties on June 9, 1987. Exhibits A and B. The leases also included personal guaranties executed by both Ritt and Jeanne. At the closing, certain adjustments were made (Exhibit D), and the plaintiffs made a $49,023.00 payment to the defendants pursuant to the adjustments in September, 1987. On or about June 10, 1987, the Tenant took possession of and started operating the two marinas.
On April 28, 1988, Gray sent the Tenant a notice of rental increase pursuant to the leases. Exhibit WW. On May 3, 1988, Ritt responded to Gray's notice by letter, informing Rubenstein and Gray that an increase in rent would be devastating and asking for a meeting with them. Exhibit XX. No meeting took place at that time and no increase in rental payments was made by the Tenant. On December 6, 1988, the Tenant wrote Rubenstein a letter, offering four proposals to aid in keeping the rent payments current and the CT Page 1318-G marinas operating without disruption. Exhibit YY. The parties never came to an agreement as to the modification of the leases. On January 1, 1989, Ritt sent Rubenstein a letter in which he informed Rubenstein that ". . . we will vacate the Clinton marina (HRM marina) . . ." on March 1, 1989 and ". . . rent the Madison marina (HH marina) at $5,000 per month on a month to month basis." Exhibit ZZ. On February 1, 1989, the parties executed a lease modification for each marina which substantially lowered the Tenant's rental obligations. Exhibits F and G. The new fixed rent for the HH Marina was $4,333.33 per month and the new fixed rental for the HRM Marina was $6,000.00 per month. The Tenant continued to operate the marinas pursuant to the modification of the leases. At all relevant times, the Tenant did all dredging "required to assure navigation" for both marinas, in accordance with Section 4.03 of both leases. Exhibits A B. At all relevant times, the Tenant made all necessary repairs to the bulkheads, in accordance to Section 4.01 of both leases. Exhibit A B.
The Tenant did not pay $60,866.60 as basic fixed rent under the HH Lease. The Tenant did not pay $99,800.00 as basic fixed rent under the HRM Lease. The Tenant failed to pay the additional CT Page 1318-H rent related to the increases in summer slip rental and winter storage rates in the amount of $1,104.00 for the HH Lease and $2,106.00 for the HRM Lease, as required by Section 2.02 of the leases. The Tenant failed to pay $8,850.62 in real estate taxes for the HH Marina and $16,287.33 in real estate taxes for the HRM Marina as required by Section 3.01 of the leases. Exhibits A, B, FF, GG, JJ and KK. The Tenant failed to pay insurance premiums as required by Section 3.01 of the leases. Exhibits A B. The plaintiffs purchased an insurance policy for the demised premises for the period September 17, 1991 through September 17, 1992 and paid a premium of $9,401.00. Exhibit LL. The Tenant's prorated share of the premium for both marinas is $7,850.00. The parties stipulated that the prevailing party would be entitled to $41,923.65 in attorney's fees. The Tenant gave the plaintiffs a security deposit of $12,500.00 for each lease pursuant to Section 22.01, for a total of $25,000.00. Exhibits A B.
DISCUSSION
The complaint in each case seeks recovery from the defendants on their guaranties of lease's executed by the Tenant. A lease is CT Page 1318-I a contract and as such is governed by the rules of contract construction. Hatcho Corporation v. Della Pietra, 195 Conn. 18, 20
(1985). The guaranty is also a contract and must be interpreted by the rules applicable to other contracts. Vespoli v. Pagliarulo,212 Conn. 1 (1989).
The court finds that the Tenant breached the leases with the plaintiffs and have not paid the plaintiffs for the damages suffered by the plaintiffs. Therefore, a judgment should enter in favor of the plaintiffs against the defendants as guarantors of said leases. "A landlord who has accepted the surrender by the tenant of the lease may sue for damages resulting from the tenant's breach of the lease. Rokalor, Inc. v. Connecticut EatingEnterprises, Inc., 18 Conn. App. 384 (1989)." MC Corp. v. Carl M.Deprofio, et al., Superior Court, Judicial District of New Haven, Docket Number CVNH 9008-3925 (December 4, 1991, Vertefeuille, J.). The plaintiff HH is entitled to judgment for rent for the months of April, 1991 through September, 1991 in the amount of $25,999.98; additional rent pursuant to Section 2.02 of the lease in the amount of $1,104.00; unpaid real estate taxes for the Grand List of October 1, 1989 and one half of the July 1, 1991 installment for CT Page 1318-J the Grand List of October 1, 1990 as additional rent pursuant to Section 3.01 of the lease in the amount of $4,428.93; and late charges for the months of April, 1991 through September, 1991 in the amount of $10,920.00 pursuant to Section 2.05 of the lease. "The plaintiff is further entitled to consequential damages equal to lost rent for the balance of the lease term." MC Corp. v. CarlM. Deprofio, et al., supra. Therefore, the plaintiff HH is entitled to judgment for the period October, 1991 through May, 1992, for an amount equal to lost basic rent of $34,666.64; for an amount equal to unpaid insurance premiums in the amount of $3,975.00; and an amount equal to unpaid real estate taxes for 8/12's of the Grand List of October 1, 1990, of $4,421.68. The plaintiff HH is not entitled to late charges for the period October, 1991 through May, 1992 because the plaintiff is not being awarded "rent" for that period. "When the (plaintiffs) accepted surrender of the tenancy, the tenancy ended and the (T)enant (nor the guarantors) w(ere) obligated to pay rent. Unpaid rent, which is not recoverable as `rent' because the lease has ended, becomes the measure of damages for the breach of the lease. Rokalor, Inc.v. Connecticut Eating Enterprises, Inc., supra at 388-389." MCCorp. v. Carl M. Deprofio, et al., supra. The judgment shall be CT Page 1318-K reduced by $12,500.00, the amount of the security deposit retained by the plaintiff.
The plaintiff HRM is entitled to judgment for rent for the months of February, 1991 through September, 1991 in the amount of $47,800.00; additional rent pursuant to Section 2.02 of the lease in the amount of $2,106.00; unpaid real estate taxes for the Grand List of October 1, 1989 and one half of the July 1, 1991 installment for the Grand List of October 1, 1990 as additional rent pursuant to Section 3.01 of the lease in the amount of $9,269.49; and late charges for the months of April, 1991 through September, 1991 in the amount of $21,840.00 pursuant to Section 2.05 of the lease. The plaintiff HRM is entitled to judgment for the period October, 1991 through May, 1992, for an amount equal to lost basic rent of $52,000.00; for an amount equal to unpaid insurance premiums in the amount of $3,975.00; and an amount equal to unpaid real estate taxes for 8/12's of the Grand List of October 1, 1990, of $7,893.60. The plaintiff HRM is not entitled to late charges for the period October, 1991 through May, 1992 because the plaintiff is not being awarded "rent" for that period. The judgment shall be reduced by $12,500.00, the amount of the security CT Page 1318-L deposit retained by the plaintiff.
The court finds that judgment should not enter in favor of the plaintiffs on their claims for dredging and bulkhead repairs. The court has found that the Tenant had met its obligations for said dredging and bulkhead repairs under the leases. The court feels the plaintiffs were trying to have the defendants pay for an enhancement of the demised premises that went well beyond what was required under the leases or was contemplated by the parties at the time of the execution of the leases.
The court shall award to the plaintiffs in each case a reasonable attorney's fees of $14,673.28. The court is not awarding the full stipulated amount of the attorney's fees because the plaintiffs did not prevail on all of their claims. Therefore, the court awarded an amount equal to the percentage of the plaintiffs' claims upon which they did prevail.
The court needs next to address the defendants' three special defenses and counterclaim. The defendants' first special defense was fraud in the inducement. The defendants must prove the; CT Page 1318-M elements of fraud in the inducement by clear and convincing evidence. Alaimo v. Royer, 188 Conn. 36, 39 (1982). The defendants have failed to meet their burden of proof in that the court has found that Exhibit 2 was a mere projection and was never represented to the defendants as anything but a projection. The defendants' second special defense was unclean hands. The court is unsure whether this special defense applies to this case. However, assuming that it does apply to this case, the defendants can not prevail, even though the standard of proof is the lesser standard of fair preponderance of the evidence. The court has found that the plaintiffs did not make any misrepresentations to the defendants in the document marked as Exhibit 2. At the time of trial and in their brief, the defendants abandoned their third special defense of the plaintiffs' failure to mitigate their damages.
The defendants' counterclaim sets forth two causes of action. The first claims fraud in the inducement, and the second claims a violation of the Connecticut Unfair Trade Practices Statutes (CUTPA). Conn. Gen. Stat. 42-100 et. seq. The first cause of action in the defendants' counterclaim of fraud in the inducement CT Page 1318-N must be proved by clear and convincing evidence. Alaimo v. Royer,
Supra. For the reasons stated previously, the defendants failed to meet their burden of proof on this cause of action. The defendants' CUTPA claim must also fail because of the reasons stated above in the discussion on the defendants' Special Defenses. Judgment shall enter in favor of the plaintiffs on the defendants' counterclaim.
CONCLUSION
Judgment shall enter in favor of the plaintiff HH for $73,016.23 plus attorneys' fees of $14,673.28. Judgment shall enter in favor of the plaintiff HRM for $132,384.09 plus attorneys' fees of $14,673.28. Judgment shall enter in favor of the plaintiffs on both of the defendants counterclaims.
Mintz, J.